# ENVIRONMENTAL PROTECTION AGENCY *v.* NATIONAL CRUSHED STONE ASSOCIATION ET AL.

No. 79–770.   Argued October 7, 1980—Decided December 2, 1980*

---

*Together with *Costle, Administrator, Environmental Protection Agency* v. *Consolidation Coal Co. et al.,* also on certiorari to the same court (see this Court's Rule 19.4).

WHITE, J., delivered the opinion of the Court, in which all other Members joined, except POWELL, J., who took no part in the consideration or decision of the cases.

*Andrew J. Levander* argued the cause *pro hac vice* for petitioners. With him on the briefs were *Solicitor General McCree, Acting Assistant Attorney General MacBeth,* and *Michele B. Corash.*

*George C. Freeman, Jr.,* argued the cause for respondents Consolidation Coal Co. et al. *Theodore L. Garrett* argued the cause for respondents National Crushed Stone Association et al. With Messrs. Freeman and Garrett on the brief were *Michael B. Barr, Robert F. Stauffer, Lawrence A. Demase, Frank J. Clements,* and *Ronald R. Janke.*†

JUSTICE WHITE delivered the opinion of the Court.

In April and July 1977, the Environmental Protection Agency (EPA), acting under the Federal Water Pollution Control Act (Act), as amended, 86 Stat. 816, 33 U. S. C. § 1251 *et seq.,* promulgated pollution discharge limitations for the coal mining industry and for that portion of the mineral mining and processing industry comprising the crushed-stone, construction-sand, and gravel categories.[1] Although the Act does not expressly authorize or require variances from the 1977 limitation, each set of regulations contained a variance provision.[2] Respondents sought review of the regulations in

---

†*J. Taylor Banks* and *Ronald J. Wilson* filed a brief for the Natural Resources Defense Council, Inc., as *amicus curiae* urging reversal.

*William W. Becker* filed a brief for the New England Legal Foundation as *amicus curiae* urging affirmance.

[1] The coal mining standards were published at 42 Fed. Reg. 21380 *et seq.* (1977), adopting 40 CFR Part 434. The mineral mining and processing standards were published at 42 Fed. Reg. 35843 *et seq.* (1977), adopting 40 CFR Part 436.

[2] The variance provision reads as follows:

"In establishing the limitations set forth in this section, EPA took into account all information it was able to collect, develop and solicit with

various Courts of Appeals, challenging both the substantive standards and the variance clause.[3] All of the petitions for review were transferred to the Court of Appeals for the Fourth Circuit. In *National Crushed Stone Assn.* v. *EPA,* 601 F. 2d 111 (1979), and in *Consolidation Coal Co.* v. *Costle,* 604 F. 2d 239 (1979), the Court of Appeals set aside the

---

respect to factors (such as age and size of plant, raw materials, manufacturing processes, products produced, treatment technology available, energy requirements and costs) which can affect the industry subcategorization and effluent levels established. It is, however, possible that data which would affect these limitations have not been available and, as a result, these limitations should be adjusted for certain plants in this industry. An individual discharger or other interested person may submit evidence to the Regional Administrator (or to the State, if the State has the authority to issue NPDES permits) that factors relating to the equipment or facilities involved, the process applied, or other such factors related to such discharger are fundamentally different from the factors considered in the establishment of the guidelines. On the basis of such evidence or other available information, the Regional Administrator (or the State) will make a written finding that such factors are or are not fundamentally different for that facility compared to those specified in the Development Document. If such fundamentally different factors are found to exist, the Regional Administrator or the State shall establish for the discharger effluent limitations in the NPDES permit either more or less stringent than the limitations established herein, to the extent dictated by such fundamentally different factors. Such limitation must be approved by the Administrator of the Environmental Protection Agency. The Administrator may approve or disapprove such limitations, specify other limitations, or initiate proceedings to revise these regulations."

See 40 CFR § 434.22 (1980) (coal preparation plants); § 434.32 (acid mine drainage); § 434.42 (alkaline mine drainage); § 436.22 (crushed stone) and § 436.32 (construction sand and gravel).

[3] The actions were brought under § 509 (b) (1) (E), which, as set forth in 33 U. S. C. § 1369 (b) (1) (E), gives the courts of appeals jurisdiction to review "the Administrator's action . . . in approving or promulgating any effluent limitation or other limitation under section 1311 . . . of this title. . . ." Plaintiffs in *National Crushed Stone* were three producers and their trade association. Plaintiffs in *Consolidation Coal* were 17 coal producers, their trade association, 5 citizens' environmental associations, and the Commonwealth of Pennsylvania.

variance provision as "unduly restrictive" and remanded the provision to EPA for reconsideration.[4]

To obtain a variance from the 1977 uniform discharge limitations a discharger must demonstrate that the "factors relating to the equipment or facilities involved, the process applied, or other such factors relating to such discharger are fundamentally different from the factors considered in the establishment of the guidelines." Although a greater than normal cost of implementation will be considered in acting on a request for a variance, economic ability to meet the costs will not be considered.[5] A variance, therefore, will not be granted on the basis of the applicant's economic inability to meet the costs of implementing the uniform standard.

The Court of Appeals for the Fourth Circuit rejected this position. It required EPA to "take into consideration, among other things, the statutory factors set out in § 301 (c)," which authorizes variances from the more restrictive pollution limitations to become effective in 1987 and which specifies economic capability as a major factor to be taken into account.[6] The court held that

"'if [a plant] is doing all that the maximum use of

---

[4] In *National Crushed Stone*, the Court of Appeals also vacated and remanded the substantive regulations. That action is not before the Court. In *Consolidation Coal*, the substantive regulations were upheld.

[5] EPA has explained its position as follows:

"Thus a plant may be able to secure a BPT variance by showing that the plant's own compliance costs with the national guideline limitation would be x times greater than the compliance costs of the plants EPA considered in setting the national BPT limitation. A plant may not, however, secure a BPT variance by alleging that the plant's own financial status is such that it cannot afford to comply with the national BPT limitation." 43 Fed. Reg. 50042 (1978).

[6] Section 301 (c), 86 Stat. 844, 33 U. S. C. § 1311 (c), allows the Administrator to grant a variance "upon a showing by the owner or operator . . . that such modified requirements (1) will represent the maximum use of technology within the economic capability of the owner or opera-

technology within its economic capability will permit and if such use will result in reasonable further progress toward the elimination of the discharge of pollutants . . . no reason appears why [it] should not be able to secure such a variance should it comply with any other requirements of the variance.' " 601 F. 2d, at 124, quoting from *Appalachian Power Co.* v. *Train,* 545 F. 2d 1351, 1378 (CA4 1976).

We granted certiorari to resolve the conflict between the decisions below and *Weyerhaeuser Co.* v. *Costle,* 191 U. S. App. D. C. 309, 590 F. 2d 1011 (1978), in which the variance provision was upheld. 444 U. S. 1069.

## I

We shall first briefly outline the basic structure of the Act, which translates Congress' broad goal of eliminating "the discharge of pollutants into the navigable waters," 33 U. S. C. § 1251 (a)(1), into specific requirements that must be met by individual point sources.[7]

Section 301 (b) of the Act, 33 U. S. C. § 1311 (b) (1976 ed. and Supp. III), authorizes the Administrator to set effluent limitations for categories of point sources.[8] With respect to existing point sources, the section provides for implementation of increasingly stringent effluent limitations in two steps. The first step to be accomplished by July 1, 1977, requires all point sources to meet standards based on "the application of

---

tor; and (2) will result in reasonable further progress toward the elimination of the discharge of pollutants."

[7] A "point source" is defined as "any discernible, confined and discrete conveyance, . . . from which pollutants are or may be discharged." § 502 (14), 33 U. S. C. § 1362 (14) (1976 ed., Supp. III).

[8] Throughout this opinion "Administrator" refers to the Administrator of EPA. In *E. I. du Pont de Nemours & Co.* v. *Train,* 430 U. S. 112 (1977), we sustained the Administrator's authority to issue the 1977 effluent limitations.

the best practicable control technology currently available [BPT] as defined by the Administrator . . . ." § 301 (b)(1) (A). The second step, to be accomplished by July 1, 1987, requires all point sources to meet standards based on application of the "best available technology economically achievable [BAT] for such category or class . . . ." [9] § 301 (b)(2) (A). Both sets of limitations—BPT's followed within 10 years by BAT's—are to be based upon regulatory guidelines established under § 304 (b).

Section 304 (b) of the Act, 33 U. S. C. § 1314 (b), is again divided into two sections corresponding to the two levels of technology, BPT and BAT. Under § 304 (b)(1) the Administrator is to quantify "the degree of effluent reduction attainable through the application of the best practicable control technology currently available [BPT] for classes and categories of point sources . . . ." In assessing the BPT the Administrator is to consider

> "the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, . . . the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate." 33 U. S. C. § 1314 (b)(1)(B).

[9] The Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816, required that the second-stage standards be met by 1983. This deadline was extended in the Clean Water Act of 1977, 91 Stat. 1567. Depending on the nature of the pollutant, the deadline for the more stringent limitations now falls between July 1, 1984, and July 1, 1987. The 1977 Act also replaced the BAT standard with a new standard, "best conventional pollutant control technology [BCT]," for certain so-called "conventional pollutants." 33 U. S. C. § 1311 (b)(2)(E) (1976 ed., Supp. III). The distinction between BCT and BAT is not relevant to the issue presented here.

Similar directions are given the Administrator for determining effluent reductions attainable from the BAT except that in assessing BAT total cost is no longer to be considered in comparison to effluent reduction benefits.[10]

Section 402 authorizes the establishment of the National Pollutant Discharge Elimination System (NPDES), under which every discharger of pollutants is required to obtain a permit. The permit requires the discharger to meet all the applicable requirements specified in the regulations issued under § 301. Permits are issued by either the Administrator or state agencies that have been approved by the Administrator.[11] The permit "transform[s] generally applicable effluent limitations . . . into the obligations (including a timetable for compliance) of the individual discharger. . . ." *EPA* v. *California ex rel. State Water Resources Control Board*, 426 U. S. 200, 205 (1976).

Section 301 (c) of the Act explicitly provides for modifying the 1987 (BAT) effluent limitations with respect to individual point sources. A variance under § 301 (c) may be obtained upon a showing "that such modified requirements (1) will represent the maximum use of technology within the economic capability of the owner or operator; and (2) will result in reasonable further progress toward the elimination

---

[10] Senator Muskie, the principal Senate sponsor of the Act, described the "limited cost-benefit analysis" employed in setting BPT standards as being intended to "limit the application of technology only where the additional degree of effluent reduction is wholly out of proportion to the costs of achieving such marginal level of reduction. . . ." Remarks of Senator Muskie reprinted in Legislative History of the Water Pollution Control Act Amendments of 1972 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress) Ser. No. 93–1, p. 170 (1973) (hereafter Leg. Hist.). Section 304 (b)(2)(B) lists "cost" as a factor to consider in assessing BAT, although it does not state that costs shall be considered in relation to effluent reduction.

[11] Establishment of state permit programs is authorized by § 402 (b), 33 U. S. C. § 1342 (b) (1976 ed., Supp. III). At present, over 30 States and covered territories operate their own NPDES programs.

of the discharge of pollutants." Thus, the economic ability of the individual operator to meet the costs of effluent reductions may in some circumstances justify granting a variance from the 1987 limitations.

No such explicit variance provision exists with respect to BPT standards, but in *E. I. du Pont de Nemours & Co.* v. *Train*, 430 U. S. 112 (1977), we indicated that a variance provision was a necessary aspect of BPT limitations applicable by regulations to classes and categories of point sources. *Id.*, at 128. The issue in this case is whether the BPT variance provision must allow consideration of the economic capability of an individual discharger to afford the costs of the BPT limitation. For the reasons that follow, our answer is in the negative.[12]

---

[12] In *Du Pont,* we held that pre-enforcement review of the BPT variance provision would be "premature," 430 U. S., at 128, n. 19. In its petition for certiorari in this case, EPA argued that the Court of Appeals erred in reviewing the variance clause prior to application of the regulation to a particular discharger's request for a variance. EPA has now abandoned this position. We agree with the Court of Appeals that whatever may have been true at the time of *Du Pont,* pre-enforcement review of the variance provision is no longer premature since EPA has now taken the definitive position that the factors specified in § 301 (c) apply only to BAT limitations, and not to BPT limitations. See 43 Fed. Reg. 44847–44848, 50042 (1978); 44 Fed. Reg. 32893–32894 (1979). But cf. n. 25, *infra.* The Court of Appeals for the District of Columbia Circuit reached the same conclusion in considering the identical variance clause in the context of BPT standards for paper mills:

"In the three years that have now elapsed since *du Pont* was briefed and argued in the Fourth Circuit, however, enough indicia of the Agency's attitude toward the 1977 variance provision under the Act has [*sic*] accumulated so that its administration is anything but 'a matter of speculation.'" *Weyerhaeuser Co.* v. *Costle,* 191 U. S. App. D. C. 309, 330, 590 F. 2d 1011, 1032 (1978) (citation omitted).

This is the proper result under the twofold test articulated in *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 149 (1967), for evaluating the ripeness of administrative action. First, the issue is "fit" for judicial decision, because it involves only a question of law: whether the Court of

## II

The plain language of the statute does not support the position taken by the Court of Appeals. Section 301 (c) is limited on its face to modifications of the 1987 BAT limitations. It says nothing about relief from the 1977 BPT requirements. Nor does the language of the Act support the position that although § 301 (c) is not itself applicable to BPT standards, it requires that the affordability of the prescribed 1977 technology be considered in BPT variance decisions.[13]

---

Appeals properly construed the Act to require EPA to consider § 301 (c) factors in granting BPT variances. Second, failure to review the variance issue now would cause "hardship" to the parties. The regulations in question affect thousands of point sources throughout the country—about 4,800 crushed-stone facilities and 6,000 coal facilities, many of them involved in this case through their trade associations. The resolution of this conflict will determine for some of these plants whether they will continue to exist or not, and for many others it will determine the level of funding they must budget for pollution controls. They should not be left to speculate on what the regulations require of them. Similarly, EPA represents to the Court that a failure to resolve the issue will cause some hardship to EPA: "a present ruling . . . would advance rather than impede the administrative enforcement of the Act." Brief for Petitioners 21, n. 17.

Moreover, in *Du Pont, supra*, we held that a uniform BPT effluent regulation must contain a variance provision, if it is to be valid. EPA has definitively stated that economic capability will not be a ground for a variance. Section 509 (b) (1) (E) provides for judicial review of effluent limitations promulgated pursuant to § 301, and these actions were brought under that section. Since the variance clause is an integral part of the regulation, review of the regulation must reach the question of whether this limitation on the scope of the variance provision renders the regulation invalid under *Du Pont*.

Finally, the fact that the Court of Appeals for the Fourth Circuit held the variance provision to be invalid, while the Court of Appeals for the District of Columbia Circuit in *Weyerhaeuser, supra*, upheld the same provision provides yet another reason for this Court to settle this controversy at this time. For all of these reasons, the issue is ripe for judicial review.

[13] It is true that in *Du Pont* we said there "[was no] radical difference in the mechanism used to impose limitations for the 1977 and the 198[7] deadlines" and that "there is no indication in either § 301 or § 304 that

This would be a logical reading of the statute only if the factors listed in § 301 (c) bore a substantial relationship to the considerations underlying the 1977 limitations as they do to those controlling the 1987 regulations. This is not the case.

The two factors listed in § 301 (c)—"maximum use of technology within the economic capability of the owner or operator" and "reasonable further progress toward the elimination of the discharge of pollutants"—parallel the general definition of BAT standards as limitations that "require application of the best available technology economically achievable for such category or class, which will result in reasonable further progress toward . . . eliminating the discharge of all pollutants . . . ." § 301 (b)(2). A § 301 (c) variance, thus, creates for a particular point source a BAT standard that represents for it the same sort of economic and technological commitment as the general BAT standard creates for the class. As with the general BAT standard, the variance assumes that the 1977 BPT standard has been met by the point source and that the modification represents a commitment of the maximum resources economically possible to the ultimate goal of eliminating all polluting discharges.

---

the § 304 guidelines play a different role in setting 1977 limitations." 430 U. S., at 127. But our decision in *Du Pont* was that the 1977 limitations, like the 1987 limitations, could be set by regulation and for classes of point sources. It dealt with the power of the Administrator and the procedures he was to employ. There was no suggestion, nor could there have been, that the 1977 BPT and the 1987 BAT limitations were to have identical purposes or content. It follows that no proper inference could be drawn from *Du Pont* that the grounds for issuing variances from the 1987 limitations should also be the grounds for permitting individual point sources to depart from 1977 standards. Indeed, our opinion recognized that § 301 (c) was designed for BAT limitations, 430 U. S., at 121, 127, n. 17. Had we thought that § 301 (c) governed variances from both the BAT and BPT standards, there would have been no need to postpone to another day, as we did in 430 U. S., at 128, n. 19, the question whether the variance clause contained in the 1977 regulations had the proper scope. That scope would have been defined by § 301 (c).

No one who can afford the best available technology can secure a variance.

There is no similar connection between § 301 (c) and the considerations underlying the establishment of the 1977 BPT limitations. First, § 301 (c)'s requirement of "reasonable further progress" must have reference to some prior standard. BPT serves as the prior standard with respect to BAT. There is, however, no comparable, prior standard with respect to BPT limitations.[14] Second, BPT limitations do not require an industrial category to commit the maximum economic resources possible to pollution control, even if affordable. Those point sources already using a satisfactory pollution control technology need take no additional steps at all. The § 301 (c) variance factor, the "maximum use of technology within the economic capability of the owner or operator," would therefore be inapposite in the BPT context. It would not have the same effect there that it has with respect to BAT's, i. e., it would not apply the general requirements to an individual point source.

More importantly, to allow a variance based on the maximum technology affordable by the point source, even if that technology fails to meet BPT effluent limitations, would undercut the purpose and function of BPT limitations. Rather than the 1987 requirement of the best measures economically and technologically feasible, the statutory provisions for 1977 contemplate regulations prohibiting discharges from any point source in excess of the effluent produced by the best practicable technology currently available

---

[14] Also, the ultimate goal expressed in § 301 (c), "the elimination of the discharge of pollutants," reflects the "national goal" specified in § 301 (b) (2) (A) of "eliminating the discharge of all pollutants." This is not the aim of a BPT limitation; its more modest purpose is to effect a first step toward this goal. Thus, while BAT limitations may be regarded as falling between a level of effluent reduction already achieved and the ultimate goal, the frame of reference within which BPT limitations are established contains neither the prior nor the subsequent measure.

in the industry. The Administrator was referred to the industry and to existing practices to determine BPT. He was to categorize point sources, examine control practices in exemplary plants in each category, and, after weighing benefits and costs and considering other factors specified by § 304, determine and define the best practicable technology at a level that would effect the obvious statutory goal for 1977 of substantially reducing the total pollution produced by each category of the industry.[15] Necessarily, if pollution is to be diminished, limitations based on BPT must forbid the level of effluent produced by the most pollution-prone segment of the industry, that segment not measuring up to "the average of the best existing performance." So understood, the statute contemplated regulations that would require a substantial number of point sources with the poorest performances either to conform to BPT standards or to cease production. To allow a variance based on economic capability and not to require adherence to the prescribed minimum technology would permit the employment of the very practices that the Administrator had rejected in establishing the best practicable technology currently in use in the industry.

To put the matter another way, under § 304, the Administrator is directed to consider the benefits of effluent reductions as compared to the costs of pollution control in determining BPT limitations. Thus, every BPT limitation represents a conclusion by the Administrator that the costs imposed on the industry are worth the benefits in pollution reduction

---

[15] EPA defines BPT as "the average of the best existing performance by plants of various sizes, ages and unit processes within each industrial category or subcategory. This average is not based upon a broad range of plants within an industrial category or subcategory, but is based upon performance levels achieved by exemplary plants." 39 Fed. Reg. 6580 (1974). See also EPA, Effluent Guidelines Div., Development Document for Mineral Mining and Processing Point Source Category 409 (1979) and Development Document for Coal Mining 225 (1976). Support for this definition is found in the legislative history, Leg. Hist. 169–170 (remarks of Sen. Muskie); id., at 231 (remarks of Rep. Jones).

that will be gained by meeting those limits. To grant a variance because a particular owner or operator cannot meet the normal costs of the technological requirements imposed on him, and not because there has been a recalculation of the benefits compared to the costs, would be inconsistent with this legislative scheme and would allow a level of pollution inconsistent with the judgment of the Administrator.[16]

In terms of the scheme implemented by BPT limitations, the factors that the Administrator considers in granting variances do not suggest that economic capability must also be a determinant. The regulations permit a variance where "factors relating to the equipment or facilities involved, the process applied, or such other factors relating to such discharger are fundamentally different from the factors considered in the establishment of the guidelines." If a point source can show that its situation, including its costs of compliance, is not within the range of circumstances considered by the Administrator, then it may receive a variance, whether or not the source could afford to comply with the minimum standard.[17] In such situations, the variance is an acknowledg-

---

[16] Respondents fail to consider this tension between a general calculation of costs and benefits and a particularized consideration of costs when they argue that because EPA only has authority to promulgate industrywide BPT regulations by analogy to its authority to promulgate industrywide BAT regulations, the same kind of economic capability/effluent reduction balancing relevant to a BAT variance must apply as well to a BPT variance.

[17] Respondents argue that precluding consideration of economic capability in determining whether to grant a variance effectively precludes consideration of the "total costs" for the individual point source. Respondents rely upon a statement by Representative Jones as to the meaning of "total cost" in § 304 (b) (1) (B):

"internal, or plant, costs sustained by the owner or operator and those external costs such as potential unemployment, dislocation and rural area economic development sustained by the community, area, or region." Leg. Hist. 231.

Unless economic capability is considered, it is argued, it will be impossible

ment that the uniform BPT limitation was set without reference to the full range of current practices, to which the Administrator was to refer. Insofar as a BPT limitation was determined without consideration of a current practice fundamentally different from those that were considered by the Administrator, that limitation is incomplete. A variance based on economic capability, however, would not have this character: it would allow a variance simply because the point source could not afford a compliance cost that is not fundamentally different from those the Administrator has already considered in determining BPT. It would force a displacement of calculations already performed, not because those calculations were incomplete or had unexpected effects, but only because the costs happened to fall on one particular operator, rather than on another who might be economically better off.

Because the 1977 limitations were intended to reduce the total pollution produced by an industry, requiring compliance with BPT standards necessarily imposed additional costs on the segment of the industry with the least effective technology. If the statutory goal is to be achieved, these costs must be borne or the point source eliminated. In our view, requiring variances from otherwise valid regulations where dischargers cannot afford normal costs of compliance would undermine the purpose and the intended operative effect of the 1977 regulations.

to consider the potential external costs of meeting a BPT limitation, caused by a plant closing. Although there is some merit to respondents' contention, we do not believe it supports the decision of the Court of Appeals. The court did not hold that economic capability is relevant only if it discloses "fundamentally different" external costs from those considered by EPA in establishing the BPT limitation; rather, the court held that the factors included in § 301 (c) *must* be taken into consideration. Section 301 (c) makes economic capability, regardless of its effect on external costs, a ground for a variance. It is this position that we reject.

## III

The Administrator's present interpretation of the language of the statute is amply supported by the legislative history, which persuades us that Congress understood that the economic capability provision of § 301 (c) was limited to BAT variances; that Congress foresaw and accepted the economic hardship, including the closing of some plants, that effluent limitations would cause; and that Congress took certain steps to alleviate this hardship, steps which did not include allowing a BPT variance based on economic capability.[18]

There is no indication that Congress intended § 301 (c) to reach further than the limitations of its plain language. The statement of the House managers of the Act described § 301 (c) as "not intended to justify modifications which would not represent an upgrading over the July 1, 1977, requirements of 'best practicable control technology.'" Leg. Hist. 232. The Conference Report noted that a § 301 (c) variance could only be granted after the effective date of BPT limitations

---

[18] Since any variance provision will permit nonuniformity with the general BPT standard for a given category, we cannot attribute much weight to those passages in the legislative history, to which EPA points, that express a desire and expectation that "each polluter within a category or class of industrial sources . . . achieve nationally uniform effluent limitations based on 'best practicable' technology no later than July 1, 1977." See Leg. Hist. 162 (statement of Sen. Muskie). See also, e. g., id., at 170; id., at 302, 309 (Conference Report); id., at 787 (Report of House Committee on Public Works). Moreover, EPA has itself stated that a variance does not represent an exception to BPT or BAT limitations, but rather sets an individualized BPT or BAT limitation for that point source: "No discharger . . . may be excused from the Act's requirement to meet BPT [and] BAT . . . through this variance clause. A discharger may instead receive an individualized definition of such a limitation or standard where the nationally prescribed limit is shown to be more or less stringent than appropriate for the discharger under the Act." 44 Fed. Reg. 32893 (1979). Therefore, expressions of an intent that "all" point sources meet BPT standards by 1977 do not necessarily support EPA's argument.

and could only be applied to BAT limitations. Similarly, the Senate Report on the Conference action emphasized that one of the purposes of the BPT limitation was to avoid imposing on the "Administrator any requirement . . . to determine the economic impact of controls on any individual plant in a single community." Leg. Hist. 170.

Nor did Congress restrict the reach of § 301 (c) without understanding the economic hardships that uniform standards would impose. Prior to passage of the Act, Congress had before it a report jointly prepared by EPA, the Commerce Department, and the Council on Environmental Quality on the impact of the pollution control measures on industry.[19] That report estimated that there would be 200 to 300 plant closings caused by the first set of pollution limitations. Comments in the Senate debate were explicit: "There is no doubt that we will suffer some disruptions in our economy because of our efforts; many marginal plants may be forced to close." Leg. Hist. 1282 (Sen. Bentsen).[20] The House managers explained the Conference position as follows:

"If the owner or operator of a given point source determines that he would rather go out of business than meet the 1977 requirements, the managers clearly expect that any discharge issued in the interim would reflect the fact that all discharges not in compliance with such 'best practicable technology currently available' would cease by June 30, 1977." *Id.*, at 231.

Congress did not respond to this foreseen economic impact by making room for variances based on economic impact. In fact, this possibility was specifically considered and rejected:

"The alternative [to a loan program] would be waiving strict environmental standards where economic hardship

---

[19] U. S. Council on Environmental Quality, Dept. of Commerce, & EPA, The Economic Impact of Pollution Control (Mar. 1972). See Leg. Hist. 156, 523.

[20] See also remarks quoted in n. 22, *infra*.

could be shown.  But the approach of giving variances to pollution controls based on economic grounds has long ago shown itself to be a risky course: All too often, the variances become a tool used by powerful political interests to obtain so many exemptions for pollution control standards and timetables on the filmsiest [sic] of pretenses that they become meaningless.  In short, with variances, exceptions to pollution cleanup can become the rule, meaning further tragic delay in stopping the destruction of our environment." *Id.,* at 1355 (Sen. Nelson).

Instead of economic variances, Congress specifically added two other provisions to address the problem of economic hardship.

First, provision was made for low-cost loans to small businesses to help them meet the cost of technological improvements.  86 Stat. 898, amending § 7 of the Small Business Act, 15 U. S. C. § 636.  The Conference Report described the provision as authorizing the Small Business Administration "to make loans to assist small business concerns . . . if the Administrator determines that the concern is likely to suffer substantial economic injury without such assistance." Leg. Hist. 153.  Senator Nelson, who offered the amendment providing for these loans, saw the loans as an alternative to the dangers of an economic variance provision that he felt might otherwise be necessary.[21]  Several Congressmen understood the loan program as an alternative to forced closings: "It is the smaller business that is hit hardest by these laws and their enforcement.  And it is that same class of business that has the least resources to meet the demands of this enforcement. . . .  Without assistance, many of these businesses may face extinction."  *Id.,* at 1359 (Sen. McIntyre).[22]

---

[21] See quotation above.

[22] Similar remarks were made by Representative Harrington ("No one in Congress wishes to legislate so irresponsibly that we drive out of

Second, an employee protection provision was added, giving EPA authority to investigate any plant's claim that it must cut back production or close down because of pollution control regulations. § 507 (e), 86 Stat. 890, 33 U. S. C. § 1367 (e).[23] This provision had two purposes: to allow EPA constantly to monitor the economic effect on industry of pollution control rules and to undercut economic threats by industry that would create pressure to relax effluent limitation rules.[24] Representative Fraser explained this second purpose as follows:

"[T]he purpose of the amendment is to provide for a public hearing in the case of an industry claim that

---

business those who sincerely wish to abide by the new pollution laws but who, because of a bad state of the economy, will be forced to close. The $800 million authorized by this section may not be completely adequate. But it is a start," Leg. Hist. 450).

[23] Section 507 (e) provides in pertinent part: "The Administrator shall conduct continuing evaluations of potential loss or shifts of employment which may result from the issuance of any effluent limitation or order under this chapter, including, where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such limitation or order. Any employee who is discharged or laid-off, threatened with discharge or lay-off . . . because of the alleged results of any effluent limitation or order issued under this chapter . . . may request the Administrator to conduct a full investigation of the matter. . . . [T]he Administrator shall make findings of fact as to the effect of such effluent limitation or order on employment and on the alleged discharge, lay-off, or discrimination and shall make such recommendations as he deems appropriate. Such report, findings, and recommendations shall be available to the public." 33 U. S. C. § 1367 (e).

[24] See Leg. Hist. 654–659. Representative Abzug emphasized the first purpose of the provision: "This amendment will allow the Congress to get a close look at the effects on employment of legislation such as this, and will thus place us in a position to consider such remedial legislation as may be necessary to ameliorate those effects." Id., at 658. Representative Miller noted that "some economic hardship, especially in smaller communities who rely on single, older plants, may result from the requirements of the pending bill," but opposed this provision because he thought that economic hardships caused by the Act should be addressed systematically by modifying the Economic Development Act. Ibid.

enforcement of these water-control standards will force it to relocate or otherwise shut down operations. . . . I think too many companies use the excuse of compliance, or the need for compliance, to change operations that are going to change anyway. It is this kind of action that gives the whole antipollution effort a bad name and causes a great deal of stress and strain in the community." Leg. Hist. 659.

The only protection offered by the provision, however, is the assurance that there will be a public inquiry into the facts behind such an economic threat. The section specifically concludes that "[n]othing in this subsection shall be construed to require or authorize the Administrator to modify or withdraw any effluent limitation or order issued under this chapter." § 507 (e), 33 U. S. C. § 1367 (e).

As we see it, Congress anticipated that the 1977 regulations would cause economic hardship and plant closings: "[T]he question . . . is not what a court thinks is generally appropriate to the regulatory process; it is what Congress intended for *these* regulations." *Du Pont*, 430 U. S., at 138.

## IV

It is by now a commonplace that "when faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965).[25] The statute itself does not provide

---

[25] Respondents contend that deference to agency interpretation is not appropriate in this case because EPA has not consistently interpreted the BPT variance requirements. However, in only one instance has EPA stated that it would consider economic capability in relation to BPT variance applications. 43 Fed. Reg. 44846–44848 (1978). This was in response to the Court of Appeals decision in *Appalachian Power Co.* v. *Train*, 545 F. 2d 1351 (CA4 1976), and EPA specifically limited this change to steam electric power generating plants, which were the subject of the court's order.

for BPT variances in connection with permits for individual point sources, and we had no occasion in *Du Pont* to address the adequacy of the Administrator's 1977 variance provision. In the face of § 301 (c)'s explicit limitation and in the absence of any other specific direction to provide for variances in connection with permits for individual point sources, we believe that the Administrator has adopted a reasonable construction of the statutory mandate.

In rejecting EPA's interpretation of the BPT variance provision, the Court of Appeals relied on a mistaken conception of the relation between BPT and BAT standards. The court erroneously believed that since BAT limitations are to be more stringent than BPT limitations, the variance provision for the latter must be at least as flexible as that for the former with respect to affordability.[26] The variances permitted by § 301 (c) from the 1987 limitations, however, can reasonably be understood to represent a cost in decreased effluent reductions that can only be afforded once the minimal standard expressed in the BPT limitation has been reached.[27]

---

[26] This argument appears in *Appalachian Power, supra,* at 1359, which the Court of Appeals relies upon in *Crushed Stone.* 601 F. 2d, at 123.

The Court of Appeals also believed that because there will be situations in which the BPT and the BAT standards are identical, see Development Document for Mineral Mining, *supra* n. 15, at 438, it would be illogical to allow a variance based on economic capability for the latter but not for the former. The result would be to "close a plant in 1979 which would be allowed to operate under a variance in 1983." 601 F. 2d, at 124. This assumes, however, that a variance would be available even though BPT standards had not been met, an assumption which EPA rejects, Brief for Petitioners 27, and which is questionable in light of the legislative history. Leg. Hist. 232 ("This provision [§ 301 (c)] is not intended to justify modifications which would not represent an upgrading over the July 1, 1977, requirements of 'best practicable control technology.'" (Rep. Jones, chairman of the House Conferees)). The suggested contradiction is accordingly unlikely to appear. In any event, it is of minor significance in considering the facial validity of the 1977 variance provisions.

[27] We find no support for respondents' contention that Congress implicitly approved the Court of Appeals' reading of the variance provision,

We conclude, therefore, that the Court of Appeals erred in not accepting EPA's interpretation of the Act. EPA is not required by the Act to consider economic capability in granting variances from its uniform BPT regulations.

The judgments of the Court of Appeals are

*Reversed.*

JUSTICE POWELL took no part in the consideration or decision of these cases.

---

when it considered and passed the 1977 amendments to the Act. Respondents rely primarily on the discussion of *Appalachian Power* in a document prepared by the Library of Congress for the House Committee on Public Works and Transportation, Case Law Under the FWPCA Amendments of 1972 (Comm. Print 1977). However, that document notes that there was at that time a conflict in the United States Courts of Appeals over the validity of the variance provision and in no way indicates that the *Appalachian Power* decision was the correct interpretation. *Id.,* at 28.