671 F.2d 801
 17 ERC 1105, 12 Envtl. L. Rep. 20,278
 APPALACHIAN POWER COMPANY; Baltimore Gas and Electric
Company; Carolina Power & Light Company; Delmarva Power &
Light Company; Duke Power Company; Monongahela Power
Company; Ohio Power Company; Potomac Edison Company; Potomac
Electric Power Company; South Carolina Electric & Gas
Company; Virginia Electric and Power Company; West Penn
Power Company, Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and Douglas
M. Costle, Administrator, Respondents,
Natural Resources Defense Council, Inc.,/R, Intervenor,
Alabama Power Company; Allegheny Power System, Inc.;
American Electric Power Company, Inc.; Arkansas-Missouri
Power Company; Arkansas Power & Light Company; Boston Edison
Company; Central and South West Services, Inc.; Central
Illinois Light Company; Central Illinois Public Service
Company; The Cincinnati Gas & Electric Company; The
Cleveland Electric Illuminating Company; Columbus & Southern
Ohio Electric Company; Commonwealth Edison Company; The
Connecticut Light and Power Company; Consolidated Edison
Company of New York, Inc.; Dallas Power & Light Company; The
Dayton Power and Light Company; The Detroit Edison Company;
Edison Electric Institute; Florida Power and Light Company;
Georgia Power Company; Gulf Power Company; Gulf States
Utilities Company; The Hartford Electric Light Company;
Holyoke Water Power Company; Houston Lighting & Power
Company; Illinois Power Company; Indiana-Kentucky Electric
Corporation; Indiana & Michigan Electric Company; Indiana &
Michigan Power Company; Indianapolis Power & Light Company;
Iowa Public Service Company; Kansas City Power & Light
Company; Kentucky Power Company; Long Island Lighting
Company; Louisiana Power & Light Company; Madison Gas and
Electric Company; Middle South Utilities, Inc.; Minnesota
Power & Light Company; Mississippi Power Company;
Mississippi Power & Light Company; Montaup Electric Company;
National Rural Electric; New England Power Company; New
Orleans Public Service, Inc.; New York State Electric & Gas
Corporation; Niagara Mohawk Power Corporation; Northeast
Utilities; Northern Indiana Public Service Company; Ohio
Edison Company; Ohio Electric Company; Ohio Valley Electric
Corporation; Oklahoma Gas & Electric Company; Pacific Gas
and Electric Company; Pennsylvania Power & Light Company;
Philadelphia Electric Company; Public Service Electric and
Gas Company; Public Service Company of Indiana, Inc.; Public
Service Company of New Hampshire; Rochester Gas and Electric
Corporation; San Diego Gas & Electric Company; Southern
California Edison Company; Southern Company Services, Inc.;
Tampa Electric Company; Texas Electric Service Company;
Texas Power & Light Company; Texas Utilities Generating
Company; Toledo Edison Company; Union Electric Company;
Western Massachusetts Electric Company; Wisconsin Electric
Power Company; Wisconsin Power & Light Company; Wisconsin
Public Service Corporation,/P, Intervenors.
 No. 80-1663.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 31, 1981.
Decided Feb. 8, 1982.
 
 George C. Freeman, Jr., Richmond, Va. (Turner T. Smith, Jr., William B. Ellis, Hunton & Williams, Richmond, Va., on brief), for petitioners.
 Donald W. Stever, Jr., Chief, Pollution Control Section, Dept. of Justice, Washington, D. C. (Anthony C. Liotta, Acting Asst. Atty. Gen., Land and Natural Resources Division, Michele Beigel Corash, Gen. Counsel, Richard G. Stoll, Jr., Asst. Gen. Counsel, Environmental Protection Agency, Washington, D. C., on brief), for respondents.
 Before JEAN S. BREITENSTEIN, Senior United States Circuit Judge for the Tenth Circuit, sitting by designation, and PHILLIPS, Circuit Judge.*
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 Appalachian Power Co. and other power companies (power companies) return to this court for the second time with a "Petition to Enforce This Court's Mandate" as issued in Appalachian Power Co. v. Train, 545 F.2d 1351, 1358-60 (4th Cir. 1976) ("Appalachian Power I "). In the first Petition, they argued that the Administrator had violated the mandate by indicating that he would refuse to consider receiving water quality as a factor in evaluating any BPT variance request under the Clean Water Act, 33 U.S.C. §§ 1251 et seq. We declined to decide the issue then because it was not clear that the Administrator would take that extreme position in practice, and the challenge was thus premature. Appalachian Power Co. v. Train, 620 F.2d 1040 (4th Cir. 1980) ("Appalachian Power II "). The Administrator has now amended the variance clause to state that a discharger's impact on receiving water quality will not in any case be considered in a BPT variance request determination. Pointing to that amendment, the power companies now contend that as amended, the clause clearly violates the plain language of the Clean Water Act and is inconsistent with this court's mandate.
 
 
 2
 The specific relief sought by the power companies is therefore that we enforce our mandate in Appalachian Power I by invalidating the offending portion of the variance clause. The Administrator opposes the petition on two grounds: 1) that the amended variance clause is not inconsistent with our Appalachian Power I mandate, and 2) that, in any event, under authoritative intervening decisions of the Supreme Court and of this court, it has now been revealed to be a valid administrative interpretation of relevant provisions of the Clean Water Act. These are the issues presented.
 
 
 3
 We conclude that the question whether the amended variance clause is inconsistent with our mandate in Appalachian Power I is, on the whole record, a debatable one which need not be resolved because, in any event, the clause as amended is consistent with presently controlling interpretations of relevant provisions of the Clean Water Act. Put another way: were the amended variance clause indeed inconsistent with our Appalachian Power I mandate, then that mandate has now been revealed by intervening, authoritative judicial decisions to be unenforceable in the way sought by the power companies.
 
 
 4
 Though our decision is therefore rested narrowly upon the validity of the amended variance clause under extant law, without regard to its possible inconsistency with our mandate in Appalachian Power I, a reasoned explanation of our decision requires some analysis of our prior decisions in this litigation as well as of the relevant statutory provisions, administrative action, and intervening decisions which we think are ultimately dispositive.
 
 
 5
 * We start with the relevant statutory framework. The goal of the Federal Water Pollution Control Act (FWPCA or the Clean Water Act), 33 U.S.C. §§ 1251 et seq., is to eliminate all pollutant discharge into national waters by 1985. Under the Act, this phasing out will be done in two phases. In the first phase, industries and municipalities discharging into navigable waters must utilize the "best practicable control technology currently available" (BPT). FWPCA § 301(b)(1)(A), 33 U.S.C. § 1311(b)(1)(A). In the second phase, they must use the "best available technology economically achievable" (BAT). FWPCA § 301(b)(2)(A), 33 U.S.C. § 1311(b)(2)(A). The Act provided that the EPA Administrator was to define BPT for classes and categories of industries. FWPCA § 304(b)(1)(A), 33 U.S.C. § 1314(b)(1)(A). In setting these generic limits, EPA is constrained by § 304(b) of the Clean Water Act.[1] EPA generally bases its evaluation on data from plants it has determined to be representative in terms of the relevant technical, engineering, and cost characteristics. Because of the possibility that these generic limitations might be inaccurate and thus unfair to an individual plant for which the factors used in the EPA generic determination were "fundamentally different," the EPA by regulation allowed for an individual determination of BPT levels based on the actual conditions at that particular plant. If the factors are determined to be fundamentally different, an individual BPT limit for that point source may be set at a level which is legally appropriate for that plant.
 
 
 6
 The applicable variance clause for the steam electric power industry, at the time of the Appalachian Power I challenge, read:
 
 
 7
 In establishing the limitations set forth in this section, EPA took into account all information it was able to collect, develop and solicit with respect to factors (such as age and size of plant, utilization of facilities, raw materials, manufacturing processes, non-water quality environmental impacts, control and treatment technology available, energy requirements and costs) which can affect the industry subcategorization and effluent levels established. It is, however, possible that data which would affect these limitations have not been available and, as a result, these limitations should be adjusted for certain plants in this industry. An individual discharger ... may submit evidence ... that factors relating to the equipment or facilities involved, the process applied, or other such factors related to such discharger are fundamentally different from the factors considered in the establishment of the guidelines....
 
 
 8
 40 C.F.R. § 423.12(a) (1974). This variance clause was first challenged in this court by the power companies on the basis that EPA violated the Act by defining too narrowly the "fundamentally different factors" that would activate the clause and be considered in making a BPT variance determination. We agreed with the power companies in Appalachian Power I, holding that this variance clause was invalid as promulgated because it was limited to technical and engineering factors, excluding all consideration of cost and affordability as well as other factors listed in relevant portions of the Act. 545 F.2d at 1358-60.
 
 
 9
 We ordered EPA to make allowance in the BPT variance clause for the factors listed in § 301(c) of the Act. Id. at 1359-60. This section authorizes the Administrator to approve modifications of the BAT limitations in an individual case where a discharger can make a satisfactory showing that the modified requirements "(1) will represent the maximum use of technology within the economic capability of the owner or operator; and (2) will result in reasonable further progress toward the elimination of the discharge of pollutants." FWPCA § 301(c), 33 U.S.C. § 1311(c). Further, we ordered EPA to make allowance in the variance clause for the factors listed in § 304(b)(1)(B) of the Act, which directs EPA in setting BPT to evaluate the "total cost of application of technology in relation to the effluent reduction benefits to be achieved ... and ... take into account ... non-water quality environmental impact (including energy requirements)...." Id., 33 U.S.C. § 1314(b)(1)(B).
 
 
 10
 On September 29, 1978, EPA amended the steam electric variance clause in an attempt to comply with Appalachian Power I. 43 Fed.Reg. 44,846-48 (1978). The following two sentences were added at the end of the variance provision:
 
 
 11
 In accordance with the decision in Appalachian Power Co. v. Train, 545 F.2d 1351, 1358-60 (4th Cir. 1976), EPA's legal interpretation appearing at 39 FR 30073 (1974) shall not apply to this paragraph. (That interpretation had stated that economic factors could not be considered in a variance determination.) The phrase "other such factors" appearing above may include significant cost differentials and the factors listed in § 301(c) of the Act.
 
 
 12
 The EPA considered that this modification complied with the requirements of the Appalachian Power I decision by allowing consideration of § 301(c) factors and "significant cost differentials." Its belief that the quoted phrase satisfied the court's mandate to permit consideration of § 304(b)(1)(B) factors presumably was because the variance clause already included the language of that section referred to by the court, with one exception. In a clarifying footnote, we had stated that the regulation need not provide for "a detailed cost-benefit analysis at the permit granting stage.... The variance provision should, however, allow the permit issuer to consider significant cost differentials of the particular point source involved." 545 F.2d at 1360 n.23. The EPA's addition of the particular language used-cost differentials-was apparently to include the single factor mentioned by the court not already enumerated in the clause.
 
 
 13
 The same group of power companies then returned to us in Appalachian Power II with a "Petition to Enforce This Court's Mandate" in Appalachian Power I. Their contention was that EPA's modification of the variance clause was defective because it failed to allow consideration of variations in receiving water quality in granting a BPT variance as assertedly was required by the language of § 304(b)(1)(B). Although counsel for the EPA contended in opposition that receiving water quality could not properly be considered in any variance determination under existing regulations, we refused to review the variance clause because it was not clear that the EPA itself had taken that position. Appalachian Power II, 620 F.2d at 1046. In our published opinion, without expressly deciding the issue, we unmistakably indicated basic agreement with the substantive position urged by the power companies. In the course of refusing to reconsider our earlier direction to include § 301(c) factors in the variance clause, we clearly reflected our belief that receiving water quality should be considered in evaluating a BPT variance request. To evaluate whether reasonable progress toward meeting the Act's goal was being made, we reasoned, it "may be appropriate to consider water quality as a factor ..." Id. (emphasis in original).
 
 
 14
 In response to Appalachian Power II, EPA amended the steam electric BPT variance clause to resolve any ambiguities regarding EPA's intent. On September 17, 1980, the Administrator added the following new sentence to the clause: "In no event may a discharger's impact on receiving water quality be considered as a factor under this paragraph." 45 Fed.Reg. 61,619 (1980).
 
 
 15
 On October 1, 1980, the power companies again petitioned for enforcement of the mandate, contending that the new amendment is in direct disobedience to the Appalachian Power I mandate, and that their claim is now ripe for adjudication.[2]
 
 II
 
 16
 The essence of the dispute throughout has centered on the language in § 304(b) (1)(B) of the Clean Water Act:
 
 
 17
 Factors relating to the assessment of best practicable control technology currently available to comply with subsection (b)(1) of section 1311 of this title shall include consideration of the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application ....
 
 
 18
 33 U.S.C. § 1314(b)(1)(B) (emphasis added). The power companies now contend that this language and this court's interpretation of the language in Appalachian Power I and II require that the EPA make provision in the BPT variance clause for a cost-benefit analysis that would include an analysis of the receiving water quality. EPA disputes this interpretation, saying that it would violate the plain intent of the FWPCA that effluent limitations and guidelines are to be based entirely upon technological standards and may not be varied or modified due to the nature or quality of the receiving waters.
 
 
 19
 In order to evaluate the power companies' position, it is necessary first to identify a critical assumption that underlay our mandate in Appalachian Power I and our dictum on the merits in Appalachian Power II ; and to analyze the effect of the Supreme Court's intervening decision in EPA v. National Crushed Stone Association, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980), on that earlier assumption. It is then necessary to evaluate what remains of Appalachian Power I and II after National Crushed Stone in light of our own intervening decision in Consolidation Coal Co. v. Costle, 604 F.2d 239 (4th Cir. 1979), rev'd in part sub nom. EPA v. National Crushed Stone Association, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980), as aided by the legislative history of the 1972 FWPCA amendments. The conclusion compelled by this analysis is that whatever implications favorable to the power companies' position may have arisen from our previous opinions in this case have now been authoritatively foreclosed by intervening developments.
 
 
 20
 In their Appalachian Power I challenge the power companies did not contend that under § 304(b)(1)(B) the variance clause must provide for consideration of receiving water quality. Their argument was more general. Essentially, they asserted that the variance clause was too narrowly drawn because it limited the factors considered in a BPT variance request to technical and engineering factors. In dealing with this contention we discussed the impact of § 304 upon it, noting that it required consideration not only of engineering aspects of the various types of control technology but also of "(1) the total cost of application of such technology (cost of achieving such effluent reduction) and (2) the resulting non-water quality environmental impact (including energy requirements)." 545 F.2d at 1359. We commented further, "Certainly the adverse non-water quality environmental impact which may result from the strict application of the agency's effluent limitations to a particular plant is as significant as the technological difficulties which may be encountered. The same may be said for a consideration of energy requirements." Id. We did not elaborate further, but simply ordered the EPA to "come forward with a meaningful variance clause ..., taking into consideration at least statutory factors set out in ... § 304(b)(1)(B) ...." Id. at 1359-60.
 
 
 21
 The impact of § 304 on the variance issue is mentioned in two other places in our Appalachian Power I opinion. In a footnote to the statement just quoted we stated that "(t)he variance provision should ... allow the permit issuer to consider significant cost differentials of the particular point source involved." Id. at 1360 n.23. Finally, in the course of holding that the requirement of § 301(b)(2)(A) that the EPA set 1983 BAT limitations which "will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants" required the EPA to evaluate the cost of achieving a particular level of reduction in relation to the "tangible environmental benefits" to be derived, 545 F.2d at 1360-65, we attempted to explain the phrase "tangible environmental benefits." We drew as an analogy upon the requirement of § 304(b)(1)(B) for "consideration of the total cost of application of technology in relation to the effluent reduction benefits," stating: "Had Congress intended merely to require (in § 304) a standard of the percentage of heat removal, it would have provided for a simple equation and the drafters would have done so." Id. at 1364 n.31.
 
 
 22
 In Appalachian Power II, addressing the power companies' contention that the EPA's "significant cost differentials" amendment to the variance clause did not comply with the Appalachian Power I mandate, we indicated general agreement with the industry position but did not decide the issue because of its prematurity. 620 F.2d at 1046. We did not in that opinion discuss the meaning of the relevant phrase in § 304(b)(1)(B) as it might bear upon that contention. In support of the petition now before us, the power companies have emphasized our further discussion in Appalachian Power II of the EPA's request that we reconsider our holding in Appalachian Power I that section 301(c) factors must be considered in BPT variance requests. In that connection we stated: "To determine whether or not progress is reasonable, we repeat, it may be appropriate to consider water quality as a factor, that is to say as an item of evidence." Id. (emphasis in original).
 
 
 23
 From all this it is at least clear that our mandate in Appalachian Power I to EPA to revise the variance clause to allow consideration of section 301(c) factors and our collateral discussion there of the meaning of "environmental benefits" were grounded in one critical assumption that is no longer tenable: that Congress intended section 301(c) factors to apply to BPT standards as well as to BAT standards. Observing that section 301(c) allowed, under certain circumstances, a variance from the 1983 BAT standards, we reasoned in Appalachian Power I that the initial phase of the plan for eliminating discharge of pollutants into navigable waters by 1985, the 1977 BPT standards, "were not intended to be applied any less flexibly than the final Phase II-1983 requirements." 545 F.2d at 1359. With this as a premise, it therefore then seemed obvious to us that the factors in section 301(c) should also apply to variance determinations respecting the BPT standards. This, rather than any definitive interpretation of § 304 underlay any perception implied in Appalachian Power I or in our dictum in Appalachian Power II that receiving water quality must be taken into account when considering BPT variance applications. See Appalachian Power II, 620 F.2d at 1046.
 
 
 24
 It is for this reason that the recent Supreme Court decision reversing our decision in National Crushed Stone Association v. EPA, 601 F.2d 111 (4th Cir. 1979), is crucial to our determination here. The issue for the Court was "whether the BPT variance provision must allow consideration of the economic capability of an individual discharger to afford the costs of the BPT limitation." 449 U.S. at 72, 101 S.Ct. at 301. This court, relying upon our Appalachian Power I analysis of the applicability of § 301(c) to BPT variance determinations, 601 F.2d at 124, had held that the affordability factor of 301(c) must be considered. 601 F.2d at 124. The Supreme Court reversed, holding that neither the plain language of the statute nor the legislative history supported the position that § 301(c) factors should apply to BPT variance determinations. Given the framework of the Act, it was illogical to suppose that affordability was intended to be a factor in BPT determinations. The Court said:
 
 
 25
 Because the 1977 limitations were intended to reduce the total pollution produced by an industry, requiring compliance with BPT standards necessarily imposed additional costs on the segment of the industry with the least effective technology. If the statutory goal is to be achieved, these costs must be borne or the point source eliminated. In our view, requiring variances from otherwise valid regulations where dischargers cannot afford normal costs of compliance would undermine the purpose and the intended operative effect of the 1977 regulations.
 
 
 26
 449 U.S. at 78, 101 S.Ct. at 304.
 
 
 27
 National Crushed Stone completely undercuts any basis the power companies may have had for claiming that the Clean Water Act as explicated and discussed by this court in Appalachian Power I and II required consideration of receiving water quality in individual BPT determinations. If § 301(c) does not require consideration of affordability factors in making those determinations, it cannot in logic require consideration of receiving water quality as a factor.
 
 
 28
 The alternative, fall-back contention that our oblique references to § 304(b) (1)(B) in Appalachian Power I support the power companies' position is equally undercut by our own later decision in Consolidation Coal Co. v. Costle, 604 F.2d 239 (4th Cir. 1979) rev'd in part sub nom. EPA v. National Crushed Stone Association, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980). The industry petitioners there argued that the variance clause for the coal industry-virtually identical to the variance clause at issue in this case-was invalid because it failed to require the agency "to take into account the quality of the receiving water when it decides whether to grant a variance." 604 F.2d at 244. The precise issue before us there was "whether the factors peculiar to a source of pollution must include comparison of the expected improvements in the receiving water with the cost of achieving them." Id. We rejected the industry argument in that case, noting that "Congress has now mandated that even if the application of the best practicable control technology to a specific source of pollution results in no significant improvement in the quality of the receiving water, that technology must still be applied." 604 F.2d at 245. Our conclusion there was consistent with Appalachian Power I, where we rejected Consolidated Edison's request for relief from BPT limitations because of the already polluted condition of the New York harbor, with the District of Columbia Circuit's resolution of the same issue in Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (D.C.Cir.1978), and with the Ninth Circuit's recent decision in Crown Simpson Pulp Co. v. Costle, 642 F.2d 323, 327 (9th Cir. 1981) cert. denied, --- U.S. ----, 102 S.Ct. 596, 70 L.Ed.2d 588 (1981) (citing Consolidation Coal Co. v. Costle, 604 F.2d 239, 244-45 (4th Cir. 1979). See Association of Pacific Fisheries v. EPA, 615 F.2d 794 (9th Cir. 1980).
 
 
 29
 The power companies in this case attempt to distinguish Consolidation Coal because it concerned an exemption from BPT rather than an individualized determination of BPT, and because it decided only that a variance could not be granted solely on evidence of existing receiving water quality and did not decide whether receiving water quality could be considered as one of many factors. These asserted distinctions are simply inaccurate. The challenge in Consolidation Coal was, as noted, to a virtually identical variance clause promulgated pursuant to § 304(b)(1)(B). Further, we clearly did evaluate "the administrator's refusal to consider receiving water quality in setting (BPT) limitations." 604 F.2d at 244 (emphasis added).
 
 
 30
 Finally, the legislative history of the 1972 FWPCA amendments conclusively demonstrates that the interpretation urged by the power companies here is contrary to legislative intent. Prior to 1972, federal water pollution control statutes had used ambient water quality standards to control pollution in interstate navigable waters. This method of setting discharge limits was cumbersome and difficult to administer. EPA v. California ex rel. State Water Resources Control Board, 426 U.S. 200, 202-03, 96 S.Ct. 2022, 2023-24, 48 L.Ed.2d 578 (1976).
 
 
 31
 In the 1972 Act, Congress fundamentally changed the method of establishing discharge limitations. EPA was to establish technology based BPT limits which were to be applied throughout each industry without regard to the quality of the waters into which the polluting discharge was made, except where applicable water quality standards required an effluent limitation more stringent than the technological standard. The Conference Committee Report explicitly stated:
 
 
 32
 The Administrator is expected to be precise in his guidelines under subsection (b) of this section (section 304), so as to assure that similar point sources with similar characteristics, regardless of their location or the nature of the water into which the discharge is made, will meet similar effluent limitations.
 
 
 33
 S.Rep.No.92-1236, 92d Cong., 2d Sess. 126 (1972), U.S.Code Cong. & Admin.News 1972, p. 3668; reprinted in 1 Senate Comm. on Pub. Works, 93d Cong., 1st Sess., A Legislative History of the Water Pollution Control Act Amendments of 1972, at 309 (1973) (hereinafter Leg.Hist.).
 
 
 34
 Further, in submitting the Conference Report to the Senate, Senator Muskie explained that the comparison between total cost and effluent reduction benefits required by § 304(b)(1) "is intended to limit the application of technology only where the additional degree of effluent reduction is wholly out of proportion to the costs of achieving such marginal level of reduction for any class or category of sources."[3] Remarks of Senator Muskie reprinted in Leg.Hist. at 170. Because receiving water quality is clearly excluded in the setting of generic BPT limitations, it must also be excluded in determining whether to grant a variance from those general limitations. The purpose of the variance is to allow an individual determination of BPT for a particular point source where it is clear that the factors considered by EPA in setting the generic BPT limitations are so different for a particular point source as to make the generic BPT limitation unfair. By definition, the variance determination must be made on the same factors that controlled the generic determination. For purposes of decision here, that is the decisive point made in National Crushed Stone, 449 U.S. at 77-78, 101 S.Ct. at 303-304.
 
 
 35
 In light of the intervening decisions of the Supreme Court in National Crushed Stone, of this court in Consolidation Coal Co., and of the legislative history cited, we conclude that the Administrator's interpretation of § 304(b)(1)(B) of the Clean Water Act as embodied in the challenged variance clause is a valid one having the force of law.[4] As the Supreme Court recently reaffirmed in National Crushed Stone : "It is by now a commonplace that 'when faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.' " 449 U.S. at 83, 101 S.Ct. at 307 (citation omitted). Without regard to whether our views earlier expressed in this litigation may have been at odds with the Administrator's interpretation, we are now persuaded by the factors cited that it is entitled to that deference here.
 
 
 36
 Accordingly, we decline to hold it invalid as violative of our mandate in Appalachian Power I and deny the power companies' petition.
 
 
 37
 DENIED.
 
 
 
 *
 Following oral argument and submission of the appeal, Circuit Judge Widener, a member of the hearing panel, was required to disqualify himself. Decision is by the remaining two members of the panel acting as a quorum. 28 U.S.C. § 46(d)
 
 
 [1]
 The relevant portions of § 304(b) are:
 (b) For the purpose of adopting or revising effluent limitations under this chapter the Administrator shall ... published (sic) ... regulations .... Such regulations shall-
 (1)(A) identify ... the degree of effluent reduction attainable through the application of the best practicable control technology currently available for classes and categories of point sources ... and
 (B) specify factors to be taken into account in determining the control measures and practices to be applicable to point sources ... within such categories or classes. Factors relating to the assessment of best practicable control technology currently available to comply with subsection (b)(1) of section 1311 of this title shall include consideration of the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, and shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate ....
 
 
 [2]
 We agree that any problems of jurisdiction caused by prematurity have been resolved by the Administrator's specific action. See EPA v. National Crushed Stone Ass'n, 449 U.S. 64, 72 n.12, 101 S.Ct. 295, 301 n.12, 66 L.Ed.2d 268 (1980)
 
 
 [3]
 This explanation clearly reveals that the "benefits" that are to be related to "costs" under § 304(b)(1)(B) are simply the benefits assumed to result in the BPT phase from any reduction in the level of effluents being discharged. It is when the cost of achieving further reductions in those levels is excessive in relation to the degree of reduction achieved that § 304(b)(1)(B) comes into play. The power companies simply misread this language when they argue that as a matter of statutory interpretation the "benefits" referred to in "effluent reduction benefits" necessarily relate to improved receiving water quality
 
 
 [4]
 This is the extent of our holding: that in the respect challenged in this pre-enforcement setting, the variance clause is a valid exercise of the EPA's regulatory power. No specific variance request has been at issue